IN THE UNITED STATES DISTRICT C0OURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| VAUGHN H. SAMUELS, | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Civil No. RDB 09-458 |
| | * | |
| CITY OF BALTIMORE, MAYOR'S OFFICE OF EMPLOYMENT DEVELOPMENT, *et al.*, | * | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Vaughn Samuels ("Plaintiff" or "Samuels"), proceeding *pro se*, has brought this employment discrimination action against the City of Baltimore, Mayor's Office of Employment Development, Mayor Sheila Dixon, Anthony Onyango, Gerald Grimes, Amy Butwin, Reggie Higgins, and Karen Sitnick (collectively "Defendants"). Plaintiff claims that he was discriminated against because of his sex and his status as a male caregiver under Maryland law and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq*. Pending before this Court is Defendants' Motion to Dismiss and/or Motion for Summary Judgment (Paper No. 7). The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2008). For the reasons set forth below, the Defendants' Motion is GRANTED.

### BACKGROUND

On March 19, 2007, Samuels was hired for the position of Career Development

Facilitator at the Mayor's Office of Employment Development ("MOED"). (Compl. ¶ 12.) In this role he was responsible for, among other things, providing employment training and educational counseling. (*Id.*) Within the MOED, Samuels' immediate supervisor was Anthony Onyango and his program manager was Gerald Grimes. Karen Sitnick served as the Director of the MOED. (*Id.* at 6, 7, 10.)

Employees of the MOED are subject to the City's Attendance Standards Policy ("the Policy"), which was developed to deter excessive absenteeism. (Defs.' Ex. B.) Under the Policy, if an employee accumulates seven "occasions" within any 12-month period, a supervisor is required to "recommend the employee for termination and an informal conference will be scheduled." (*Id*. at 7.) An "occasion" is defined as "any period of unscheduled absence for the same reason," and an unscheduled absence is defined as "[a]n absence that is not scheduled in advance." (*Id*. at 2-3.) In addition, the failure of an employee to report to or remain at work is considered to be an occasion. (*Id.* at 2.) The Policy allows for three "emergency absences" during a rolling year that are not recognized as occasions. (*Id*. at 4.)

Between late August and early October of 2007, Samuels incurred four occasions. (Defs.' Exs. C, D, E, and F.) After his fourth occasion, Samuels received a written warning concerning his attendance and was advised to contact the Employee Assistance Program in accordance with the Policy. (Defs.' Ex. B at 6.) In early October, Samuels also expended his three "emergency occasions" for the rolling year. (Defs. Ex. K.)

On November 20, 2007, Samuels incurred his fifth occasion and he was subsequently given written notice that he would be suspended for three days and placed on a work improvement plan, as required by the Policy. (Defs.' Exs. B at 6, and G.) On January 28, 2008, Plaintiff received his sixth occasion, and he was ultimately counseled about his attendance and

given notice that he would serve a five-day suspension. (Defs.' Exs. B at 7, and 8.) Samuels was warned that he would be subject to termination in the event that he incurred another unscheduled absence. (Defs.' Ex. H.) Because of administrative delay, Samuels' sixth occasion was not completely processed until February 8, 2008.

On February 4, 2008, Samuels incurred his seventh occasion when he left work early because one of his children was sick. (Defs.' Ex. I.) The following day Samuels was recommended for termination. (Pl.'s Ex. EE.) On February 11, Samuels began serving a five day suspension for his sixth occasion. (Defs.' Ex. H.) Due to an intervening holiday and because he took a week of approved bereavement leave, Compl. ¶ 45, Samuels did not return to work until February 29, at which time he was immediately placed on administrative leave. (Defs.' Ex. I.) Finally, on March 6, 2008, he was terminated. (*Id.*)

Samuels alleges that he was discriminated against because of his status as a male caregiver to his four children, who are all under the age of nine. He claims that his work absences related to his care-giving responsibilities. Specifically, he states that they resulted from his custody battles with his estranged wife, his children's sicknesses, and because of difficulties in securing childcare. (Compl. ¶¶ 15-17, 22, 23, 28, 34, 38.) In his Complaint Samuels cited instances when Onyango and Grimes made references to his role as a caregiver. (*Id.* at ¶¶ 20, 30, 34.) For instance, Grimes allegedly told Samuels:

> You are getting upset for no reason and allowing things that shouldn't bother you to bother you. For that I am recommending you to go to Employee Assistance Program (EAP) so you can learn how to manage your crisis. You don't have to do it, it is just a recommendation. Because, if you don't have a job you won't have to worry about custody and you need this job in order to maintain what you have.

(*Id.* at ¶ 20.) Onyango later informed Samuels that "you need to have someone else watch your child and I am not going to approve your leave due to your attendance." (Compl. ¶ 34.)

3

In addition, Samuels was admonished on several occasions for his continued absences. (*Id.* at ¶¶ 29, 30, 34) Onyango allegedly told Samuels that "Mr. Grimes and I have done all we can do to assist you.  It is taking longer than we thought.  I have never had a situation like this and now it is really going to have an impact on your job." (*Id.* at ¶ 29.) Onyango also told Samuels that he "needed to start putting the job first . . . I need people here that can work and you are not doing that.  As Mr. Grimes said that you have to manage the crisis.  Your absences are having an impact on your employment and this job is important so that you can support your children." (*Id.* at ¶ 30.) Finally, in December of 2007, Samuels received a Work Improvement Plan ("WIP") after nine months of employment for not meeting or exceeding the MOED's expectations. (*Id.* at ¶ 33.) Samuels claims that the WIP he received was premature because the MOED Employee Performance Appraisal Program provides that WIPs can only be issued after an employee has been employed for a year. (*Id.*)

Samuels filed his formal charge of discrimination with the EEOC on February 13, 2008. (*Id.* at ¶ 41.) On February 19, 2008, Samuels was called into a meeting with Onyango, Grimes and Higgins. (*Id.* at ¶ 43.) Samuels alleges that during this meeting he expressed his concerns that he was being discriminated against because of his status as a male caregiver.  Also on February 19, Samuels modified his complaint of discrimination to include retaliation. (*Id.* at ¶ 47.) On February 26, Higgins allegedly contacted the EEOC to request an extension to respond to the Charge of Discrimination. (*Id.* at ¶ 48.) Samuels received his right to sue letter on November 27, 2008, and he timely filed this action on February 23, 2009.

## STANDARD OF REVIEW

**I. Motion to Dismiss**

Under Rule 8(a)(2), a complaint must contain a "short and plain statement of the claim

showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a). Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action" in order to survive a motion to dismiss. *Id.* at 555.

To survive a Rule 12(b)(6) motion, the legal framework of the complaint must be supported by factual allegations that "raise a right to relief above the speculative level." *Id.* On a spectrum, the Supreme Court has recently explained that the plausibility standard requires that the pleader show more than a sheer possibility of success, although it does not impose a "probability requirement." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**II. Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.*

In undertaking this inquiry, a court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). After the moving party has established the absence of a genuine issue of material fact, the nonmoving party must present evidence in the record demonstrating an issue of fact to be resolved at trial. *Pension Ben. Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005). Summary judgment will be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

This Court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

## DISCUSSION

### I. The Mayor's Office of Employment Development is Not a Proper Defendant

The Baltimore City Charter created a municipal corporation known as the Mayor and City Council of Baltimore, which "may sue or be sued." BALT. CITY CHARTER (1996 ed.), Art. 1, § 1. As Defendants correctly note, while the Charter formally established the Mayor's Office of Employment Development ("MOED"), it did not grant the MOED any power to sue or

be sued under the law.  Instead, MOED is merely a branch of city government and is not a proper party in this lawsuit.

Under normal circumstances, this Court would be inclined to grant Samuels leave to file an Amended Complaint that properly designates the "Mayor and City Council of Baltimore" as a defendant.  *See* Fed. R. Civ. P. 15(a) (providing that a "court should freely give leave when justice so requires").  However, this Court finds that summary judgment would still be entered against Samuels, even if his Complaint were properly recaptioned.  Thus, because such an amendment would be futile, leave to amend is hereby denied.  *See New Beckley Mining Corp. v. International Union, UMWA*, 18 F.3d 1161, 1164 (4th Cir. 1994) (stating that "[a] court may refuse to allow leave to amend pleadings when the proposed changes would be futile").

    **II.**        **Article 49B of the Maryland Code Does Not Provide a Private Cause of Action**

In Count III of his Complaint, Samuels has asserted a cause of action under Maryland's state anti-discrimination laws.  However, Article 49B of the Maryland Code does not give rise to a private right of action.  *See, e.g.*, *Parlato v. Abbott Lab's*, 850 F.2d 203, 205 (4th Cir. 1988) (noting that "Article 49B itself does not create a private cause of action."); *Jordan v. CSX Intermodal, Inc.*, 991 F. Supp. 754, 756 n.1 (D. Md. 1998) (explaining that Article 49B "empower[s] only the Maryland Human Rights Commission to initiate litigation upon an employer's refusal to comply with the Commission's orders" and "does not create a private cause of action"); *Shabbaz v. Bob Evans Farms, Inc.*, 163 Md. App. 602, 623 (Md. Ct. Spec. App. 2005) ("Unlike Title VII, article 49B does not create a general private cause of action in favor of victims of discrimination.").  Consequently, Count III of Samuels' Complaint is hereby dismissed.

    **III.**        **Title VII Claims**

Title VII of the Civil Rights Act of 1964 provides that "it shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Samuels alleges that in the course of his employment, he was discriminated against on the basis of sex and his status as a male caregiver.[1] More specifically, he claims that he was subjected to discriminatory treatment and a hostile work environment, and that he was terminated in retaliation for his filing of a discrimination claim.

While Title VII does not protect against discrimination based on caregiving responsibility, it does prohibit discrimination based on sex. Accordingly, Samuels' Complaint is construed as asserting a claim of "sex plus" discrimination, under which he alleges that he was terminated because he is a man who has children. A "sex plus" theory of discrimination is based upon allegations that an employer disparately treated a subclass within a protected class. *See Fisher v. Vassar Coll.*, 70 F.3d 1420, 1433 (2d Cir. 1995) (defining "sex-plus" discrimination as discrimination where "sex is considered in conjunction with a second characteristic . . . ."); *see also Jordan v. Radiology Imaging Assocs.*, 577 F. Supp. 2d 771, 785 (D. Md. 2008); *Hess-Watson v. Potter*, 2004 U.S. Dist. LEXIS 53, at *5-7 (W.D. Va. Jan. 4, 2004).

In weighing Samuels' claims under Title VII, this Court considers the Defendants' motion as one for summary judgment. When "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule

---

[1] In the Complaint, Mayor Sheila Dixon, Anthony Onyango, Gerald Grimes, Amy Butwin, Karen Sitnick and Reggie Higgins are named as defendant supervisors who are being sued in their individual capacities. (*See* Compl. at ¶¶ 4-10.) However, it is well-established that "supervisors are not liable in their individual capacities for Title VII violations." *Lissau v. Southern Food Servs, Inc.,* 159 F.3d 177, 180 (4th Cir. 1998). In *Lissau*, the Fourth Circuit held that only an employer may be held liable for Title VII violations, and that individual liability under the Act "would improperly expand the remedial scheme crafted by Congress." *Id*. at 181.

8

56." Fed. R. Civ. P. 12(d). As both parties have attached a series of exhibits to their briefs, they have been on notice that the present motion may be treated as one for summary judgment. *See Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 198) ("When a party is aware that material outside the pleadings is before the court, the party is on notice that a Rule 12(b)(6) motion may be treated as a motion for summary judgment.").

### A. Title VII Sex Discrimination

In Count I of his Complaint, Samuels asserts a claim of sex discrimination.[2] A plaintiff may establish such a claim under either the "mixed-motive" framework or the "burden-shifting" schema set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973). *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 284-85 (4th Cir. 2004).

To establish a claim of sex-plus discrimination under the mixed-motive approach, Samuels must demonstrate, through direct or circumstantial evidence, that his role as a male caregiver "was a motivating factor" in his employer's decision to terminate him. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-86 (4th Cir. 2004) (en banc).

Direct evidence is defined as "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotations omitted). Direct evidence is said to prove a fact "without any inference or presumptions." *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548 (4th Cir. 1995). A discriminatory statement must also be shown to bear some nexus with the adverse employment action. *Id.* Under the mixed-motive framework, "a plaintiff faces a demanding standard when attempting to demonstrate

---

[2] In his Opposition brief Samuels does not present any arguments in support of his claim of discrimination under Count I. Instead, he only addresses his claims in Count II that allege retaliation and a hostile work environment. Nevertheless, this Court views the record in the light most favorable to the Plaintiff and fully considers Samuels' claim in Count I.

direct evidence." *Jordan*, 577 F. Supp. 2d at 779.

Samuels alleges that on several occasions his supervisors admonished him for his attendance problems and made references to his role as a caregiver. (Compl. ¶¶ 20, 29, 30, 34.) However, none of these statements cited by Samuels constitute direct evidence of gender discrimination; they merely represent gender neutral comments about parenting in general that do not indicate any prejudice aimed at male caregivers in particular. *See Jordan*, 577 F. Supp. 2d at 780 (noting that gender-neutral statements evidencing an employer's perceptions about parents in general do not serve as direct evidence of unlawful gender discrimination).

In the absence of any direct evidence in support of his claim, Samuels presents certain factual allegations that purport to serve as circumstantial evidence of discrimination. He states that he was repeatedly criticized for his absences from work, Compl ¶¶ 29, 30, 34, and that he prematurely received a WIP for not meeting his employer's expectations. (*Id.* at ¶ 33.) Finally, he claims that on several occasions he attempted to provide his supervisors with documentation explaining the reasons for his prior absences, but that such documentation was disregarded.[3] (*Id.* at ¶¶ 31, 32, 34, 37.) However, these allegations do not suffice as circumstantial evidence because they do not suggest that Samuels was discriminated against because of his status as a male caregiver. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000) ("the ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination").

Finally, because Samuels has not provided any evidence of gender discrimination, he cannot make out a *prima facie* case of discrimination.[4] It is well-established that in order "to

---

[3] Samuels' point here is misguided, as the Policy expressly requires an employee to receive supervisor approval *in advance* of a requested date of absence. (Defs.' Ex. B at 3.)

[4] Under the *McDonnell Douglas* scheme, a plaintiff first bears the burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53

establish a *prima facie* case based on a 'sex plus' theory of employment discrimination, the plaintiff must show that similarly situated [women] were treated differently than [men]." *Hess-Watson*, 2004 U.S. Dist. LEXIS 53, at *6; *see also, Jordan*, 577 F. Supp. 2d at 785 (rejecting plaintiff's "sex plus" claim where she failed to present "any evidence that women with children were treated differently from men with children").  Because Samuels has not offered any evidence that he was treated differently from female caregivers in the MOED, he has failed to present a *prima facie* case of sex-plus discrimination.

Finally, even if Samuels could make a *prima facie* case of discrimination, Defendants have cited a nondiscriminatory justification for his termination.  Violations of an established attendance policy provide a legitimate non-discriminatory justification for an employee's discharge.  *See, e.g.*, *Fleming v. Borden, Inc.*, 829 F. Supp. 160, 163 (D. S.C. 1992) (noting that "excessive absenteeism under defendant's policy provides a legitimate, non-discriminatory reason" for dismissal); *Cunningham v. Owens-Illinois*, 669 F. Supp. 757 (S.D.W.V. 1987) (finding that a poor record of attendance is a legitimate non-discriminatory reason for termination).

**B.  Retaliation Claim**

Title VII contains, in addition to its general antidiscrimination provision, an antiretaliation provision in Section 704(A) that provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

---

(1981).  If a plaintiff successfully presents a *prima facie* case, the burden shifts to the employer to provide a legitimate, nondiscriminatory justification for its action.  *Id.*  Finally, if the employer carries its burden, the plaintiff must show that the employer's legitimate, nondiscriminatory reason is merely a pretext for discrimination.  *Id.*

42 U.S.C.A. § 2000e-3(a).  This provision is designed to "prevent[] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees."  *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S 53, 63 (2006).  To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must demonstrate that (1) he engaged in protected conduct; (2) his employer took an adverse employment action against him; and (3) the protected conduct was causally connected to the adverse action."  *Ziskie v. Mineta,* 547 F.3d 220, 229 (4th Cir. 2008).

To satisfy the third prong of a *prima facie* case, a plaintiff must show that the defendant "fired him *because* the plaintiff engaged in a protected activity."  *Holland v. Wash. Homes, Inc.,* 487 F.3d 208, 218 (4th Cir. Md. 2007) (citation omitted) (emphasis in original).  Temporal proximity between a complaint and a termination can sometimes provide an inference of retaliation.  *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003).  However, such an inference may be eliminated by other evidence showing that a substantial step toward termination had occurred prior to the employee's submission of a complaint.  *See, e.g.*, *Horne v. Reznick Fedder & Silverman*, 154 Fed. Appx. 361, 364 (4th Cir. 2005).  Thus the important question is whether the decisionmaker had knowledge of the protected activity at the time of the adverse employment action.  *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("[s]ince, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the *prima facie* case").

The City's Attendance Policy provides that upon the incurrence of a seventh occasion, an employee's supervisor "will recommend the employee for termination and an informal conference will be scheduled."  (Defs.' Ex. B at 7.)  The record indicates that Samuels incurred

his seventh occasion on February 4, 2008, Defs.' Ex. I, and that he was recommended for termination on the following day.  (Pl.'s Exs. EE and FF.)  Samuels filed his charge of discrimination more than a week later on February 13, 2008.  (Compl. ¶ 41.)  Because of administrative delay, Plaintiff's termination did not occur until March 6, 2008.

Samuels was not officially terminated until several weeks after he filed his charge of discrimination.  However, Onyango's recommendation for termination, made on February 5, is the main point of reference on the issue of causality.  Therefore, despite the fact that Samuels' supervisors may have been aware of his discrimination charge when the termination was finalized, the critical step in the process had occurred before the filing of the charge.  *See, e.g.*, *Swigert v. Broadway Servs.*, 2009 U.S. Dist. LEXIS 60333, at *28-30 (D. Md. July 15, 2009) (rejecting retaliation claim on basis that the decision to terminate preceded plaintiff's filing of discrimination charge); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (stating that "employers need not suspend previously planned [adverse employment actions] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitely determined, is no evidence what[so] ever of causality"). Because the evidence in the record does not indicate any nexus between his complaint and his termination, Samuels cannot make a *prima facie* case for retaliation.

### C.  Hostile Work Environment Claim

Finally, Samuels claims that he was unlawfully subjected to a hostile work environment. To establish a claim on the basis of a hostile work environment because of sexual harassment, a plaintiff must show that the offending conduct (1) was unwelcome, (2) based on plaintiff's sex, (3) was severe enough to alter the conditions of plaintiff's employment and create an abusive work environment, and (4) was imputable to the employer.  *Ziskie v. Mineta*, 547 F.3d 220, 224

(4th Cir. 2008).

Samuels' hostile work environment claim—like his other claims under Title VII—is undermined by the fact that there is nothing in the record indicating that Samuels was improperly treated on account of his status as a male caregiver. *Ziskie*, 547 F.3d at 226 (noting that even if a plaintiff alleges that he "was the target of open hostility . . . the evidence must allow a reasonable jury to conclude that [his] mis-treatment was due to [his] gender"). The record instead indicates that his supervisors' comments to him were related to his repeated absenteeism, a perfectly legitimate subject for an employer's concern.

Moreover, Samuels cannot show that his supervisors' conduct was sufficiently "severe or pervasive" to create an abusive work environment. When assessing the third prong of a hostile sexual environment claim, courts are mindful that "an objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift Sys.,* 510 U.S. 17, 21-22 (1993) (internal brackets omitted)); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (noting that "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position") (internal quotations omitted). Towards this end, courts look at the totality of the circumstances to determine whether a work environment is hostile or abusive. *Harris*, 510 U.S. at 23. These circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Id*.

Samuels' showing does not meet the high standard that is required for proving a hostile

work environment. The conduct and statements referenced by Samuels could not be objectively considered to be frequent, severe, physically threatening or humiliating. *See Harris*, 510 U.S. at 23. Indeed, many of the statements made by Samuels' supervisors could instead be interpreted as helpful in that they advise on how to avoid future occurrences under the Policy.

## **CONCLUSION**

For the foregoing reasons, this Court GRANTS Defendants' Motion to Dismiss and/or Motion for Summary Judgment (Paper No. 7). A separate Order follows.


Dated: October 15, 2009                                    /s/_____
                                                           Richard D. Bennett
                                                           United States District Judge